**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-4029

_____

*A. G., ON HER OWN BEHALF,
Appellant

v.

THE LOWER MERION SCHOOL DISTRICT

*(Amended pursuant to the Court's Order dated 4/26/2013)

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-05025)
District Judge:  Honorable Harvey Bartle, III

_____

Argued September 24, 2013
Before: AMBRO, FISHER and HARDIMAN, *Circuit Judges*.

(Opinion Filed:  November 14, 2013)

Jesse M. Boodoo
Elizabeth N. Dewar (ARGUED)
Ropes & Gray
800 Boylston Street
Prudential Tower
Boston, MA  02199

Benjamin D. Geffen
Sonja D. Kerr
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway
United Way Building, 2nd Floor
Philadelphia, PA  19103

*Counsel for Appellant*

Jenna B. Berman
Amy T. Brooks
Michael D. Kristofco (ARGUED)
Wisler Pearlstine
460 Norristown Road, Suite 110
Blue Bell, PA  19422
    *Counsel for Appellee*

William T. McEnroe
Will W. Sachse
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA  19104
    *Counsel for Amicus Appellant*

————————

OPINION OF THE COURT

————————

FISHER, *Circuit Judge*.

A.G. appeals from the United States District Court for the Eastern District of Pennsylvania's grant of summary judgment in favor of the Lower Merion School District ("LMSD") on the ground that A.G. failed to produce sufficient evidence in support of her claim that LMSD acted with deliberate indifference to her federally protected rights.  For the reasons that follow, we will affirm.

I.

We write principally for the parties, who are familiar with the factual context and legal history of this case.  Therefore, we will set forth only those facts that are necessary to our analysis.

A.G., who is African American, attended elementary school, middle school, and high school in LMSD. In October 2001, when A.G. was in the third grade, an LMSD representative prepared a report concluding that A.G. required speech therapy to correct her pronunciation of certain sounds caused by a lisp. This therapy was administered as part of the special education curriculum. Also during third grade, LMSD placed A.G. into "Title I," a remedial program for any student who needed additional instruction in math or reading. Title I supplemented A.G.'s schoolwork by providing extra instruction in her regular classroom.

Near the end of A.G.'s third grade year, several LMSD personnel, including A.G.'s classroom teacher, prepared and submitted a "Referral Form" regarding A.G.'s academic performance. The form included an observation by one of A.G.'s teachers that she was progressing slowly in reading, writing, and math. LMSD sought permission from A.G.'s parents to evaluate A.G. to determine an appropriate educational program. At that time, LMSD also provided A.G.'s parents with a "Procedural Safeguards Notice," a form given to parents explaining the duties, protections, and remedies available to both the parents and LMSD when LMSD evaluates a student for special education, places a student into special education, or changes a student's special education curriculum. LMSD received permission from A.G.'s parents to conduct the initial special education evaluation on August 7, 2002.

In November 2002, during A.G.'s fourth grade year, LMSD's school psychologist, Santa Cucinotta, began meeting with A.G. for evaluation purposes. During those

meetings, she confirmed that A.G. was progressing slower than her peers in reading and math. Based on those evaluations, she concluded that A.G. had a learning disability, which could be addressed through specially designed instruction. She also concluded that A.G. had a secondary disability requiring speech and language therapy.

During the same school year, A.G.'s mother, Ms. Cucinotta, and other LMSD employees discussed Ms. Cucinotta's evaluations as they related to A.G.'s educational needs. LMSD proposed to provide A.G. with additional learning support and continued speech and language therapy. A.G.'s mother approved the proposal in February 2003. Thereafter, A.G.'s mother attended Individualized Education Program ("IEP") meetings for the remainder of A.G.'s time in elementary school. The IEP meetings provided A.G.'s mother an opportunity to discuss her daughter's special education needs with LMSD personnel.

A.G. attended middle school in LMSD from 2004 to 2007. During this time, A.G. continued in her special education program, which included an Instructional Support Lab ("ISL") for additional instruction in various academic disciplines. Because of when ISL was scheduled, A.G. was unable to take classes in certain subject areas. A.G.'s special education needs were not reevaluated during middle school because both her mother and LMSD agreed that reevaluation was unnecessary.

A.G. began attending high school in LMSD in 2007 when she was in the ninth grade. At that point, she was given some discretion regarding her special education curriculum. She selected her classes on her own and participated in IEP meetings.

Similar to middle school, however, A.G. encountered some limitation regarding her ability to take courses that conflicted with her special education program.

Also in ninth grade, A.G.'s mother granted LMSD permission to reevaluate A.G.'s special education needs. LMSD psychologist Dr. Craig Cosden evaluated A.G. and, in February 2008, produced a report that documented his findings. The report included concerns from A.G.'s mother about A.G.'s performance on homework assignments, as well as her lack of ability to focus on schoolwork, and a review of A.G.'s grades earned in the eighth and ninth grades. The report also documented A.G.'s poor standardized test scores and instances of inappropriate and disruptive behavior in classes, as reported by her teachers.

Dr. Cosden administered several other tests at the recommendation of A.G.'s IEP team. These tests included an intelligence test, an achievement test, a behavioral assessment test, and a test that measured skills related to learning. A.G. received scores ranging from below average to above average on the various tests. Based on his evaluation and A.G.'s test scores, Dr. Cosden concluded that A.G. no longer had a specific learning disability. Nevertheless, Dr. Cosden concluded that she remained "eligible for special education services," noting that her "disability category should be changed to Other Health Impairment ["OHI"] to reflect problems with focusing and difficulty controlling her emotions." A922. Dr. Cosden testified in his deposition that he suspected A.G. had attention deficit hyperactivity disorder ("ADHD") at that time, but was unable to diagnose her as having that condition with the information available to

him.  While he did not have a label for A.G.'s behavior, Dr. Cosden testified that, in his opinion, an OHI qualified A.G. for special education services.  A.G.'s parents signed off on Dr. Cosden's reevaluation report in April 2008.

In September 2008, when A.G. was in the tenth grade, A.G.'s mother approved a reduction in the number of ISL classes that A.G. would take as part of her curriculum. Shortly thereafter, A.G.'s IEP team met and recommended a further reduction in the number of her ISL classes.  The reductions were made without special education reevaluation.

During A.G.'s senior year of high school, her father began to doubt the nature of her learning disability and her need for special education.  He filed a due process complaint in which he sought to have A.G. removed from the special education curriculum, and requested that LMSD pay for A.G. to undergo an independent educational evaluation ("IEE") by a professional unaffiliated with LMSD.  Around the same time, LMSD proposed to remove A.G. from the special education curriculum entirely.  A.G.'s father disapproved of the school district's proposal and insisted that a hearing officer decide whether she continued to need special education classes.

In August 2011, A.G. and her parents filed suit in the District Court, alleging that LMSD violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act.  The District Court dismissed A.G.'s parents from the initial action, noting that A.G. was over the age of 18 when the complaint was filed and could therefore proceed on her own behalf.  The Court then held that A.G. needed to prove that LMSD

intentionally discriminated against her in order to recover compensatory damages on her

claim.  After concluding that she failed to do so, the District Court entered summary

judgment in favor of LMSD.  A.G's. timely notice of appeal followed.

II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have

appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's grant of summary judgment *de novo*, applying the

same standard as the district court.  *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413

(3d Cir. 2011).  A grant of summary judgment is appropriate only where the moving

party has established "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact

is any fact that might affect the outcome of a suit under the governing substantive law.

*Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012).  "To

demonstrate that no material facts are in dispute, the moving party must show that the

non-moving party has failed to establish one or more essential elements of his or her

case." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535,

538 (3d Cir. 2006).  The reviewing court should "view the facts in the light most

favorable to the non-moving party and make all reasonable inferences in that party's

favor." *Id.*

In order to prevail on a motion for summary judgment, the non-moving party must

"show specific facts such that a reasonable jury could find in that party's favor, thereby

establishing a genuine issue of fact for trial." *Id.*  The evidence presented by the non-moving party may be either direct or circumstantial, and need not be as great as a preponderance, but there must be more than a scintilla of evidence to prevail.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

III.

A.

A.G. first argues that a specific intent to discriminate is not a required element of her claims under § 504 and the ADA and that the District Court erred in requiring her to demonstrate intentional discrimination.  In the alternative, A.G. argues that even if an intent to discriminate is a required element, the correct standard to apply in § 504 and ADA claims is deliberate indifference.  We agree in part and disagree in part.

To establish claims under both § 504 and the ADA, a plaintiff must demonstrate that: (1) she has a disability, or was regarded as having a disability; (2) she was "otherwise qualified" to participate in school activities; and (3) she was "denied the benefits of the program or was otherwise subject to discrimination because of her disability."  *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).  When a plaintiff seeks compensatory damages, this Court requires a showing of intentional discrimination.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. Sept. 5, 2013).  We have held that the remedial goals of the Rehabilitation

Act and the ADA, however, suggest that a standard of deliberate indifference, rather than discriminatory animus, may satisfy that showing. *Id.* at 264.

In the present case, neither A.G. nor LMSD dispute that the first two elements are satisfied; thus, the only issue before this Court is whether A.G. raised a genuine issue of material fact as to whether LMSD denied A.G. educational benefits or otherwise discriminated against her because it regarded her as having a disability. Because we have previously concluded that the standard for claims brought under § 504 and the ADA for compensatory damages is deliberate indifference, *id.* at 264, A.G. must point to evidence in the summary judgment record that creates a genuine issue of material fact as to whether LMSD acted with deliberate indifference when it placed and kept her in special education.

B.

The two-part standard generally applied for establishing deliberate indifference requires: (1) "knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *S.H.*, 729 F.3d at 263 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (internal quotation marks omitted). "Deliberate indifference requires *actual knowledge*;" thus, "allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *Id.* at 266 n.26 (emphasis in original) (quoting *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012)). Application of this standard "does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 263 (quoting *Meagley v.*

*City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)).

It does, however, require a "deliberate choice, rather than negligence or bureaucratic

inaction." *Id.* (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir.

2009) (internal quotations omitted)).

A.G. argues that the District Court erred in granting summary judgment in favor of

LMSD on her § 504 and ADA claims because she adduced sufficient evidence from

which a jury could conclude that LMSD acted with deliberate indifference in regarding

her as having various disabilities and discriminating against her on that basis.  A.G.'s

conclusion is based upon: (1) her personal testimony regarding her experience in LMSD's

special education program; (2) LMSD's alleged "gross" and "knowing" violations of the

Individuals with Disabilities Education Act ("IDEA"); (3) the repeated nature of LMSD's

violations of the IDEA; and (4) her perception that LMSD deliberately misled her and her

family about her supposed disability.  We find the record on these issues insufficient to

create a genuine factual dispute as to knowledge.  We will address each of her arguments

as to the establishment of deliberate indifference in turn. [1]

---

[1] A.G. also sets forth in her brief that "the problem of over-identification of children, particularly African American children, is a real, serious, and all-too-common problem."  Appellant's Br. at 34.  In support of this claim, she refers the Court to a brief filed by the Association of Black Psychologists as *amicus curiae*, which details the lasting harm caused by the disproportionate placement of African American children in special education classes.  *See Brief of the Association of Black Psychologists as Amicus Curiae Supporting Appellants*, A.G. v. Lower Merion Sch. Dist., (No. 12-4029).  A.G. has failed to set forth any evidence that LMSD acted with racially discriminatory purposes when identifying African American students as disabled and offering them special education services.  We therefore reject this argument.

*(1)*

A.G. first argues that her own testimony regarding her experience in LMSD's special education program supports her § 504 and ADA claims. That testimony indicated that the special education curriculum caused her to miss out on some regular education classes taken by students who were not in special education. A1683. She also claims that, since her grades in her special education classes did not count toward her cumulative grade point average ("GPA"), her GPA was artificially lowered, resulting in her inability to gain entrance to "better colleges." A1683. Finally, A.G. refers to the entirety of the program as "pointless," a "waste of time," and "constant hand-holding." A1683.

Having reviewed the record, it does not appear that A.G. expressed any of the concerns that she presents now to LMSD while she was in its special education program. Even if she had, her reliance on this testimony would still be unpersuasive. Had A.G. expressed her concerns, it would have put LMSD on notice of nothing more than the fact that she may have been unhappy in her program. Moreover, A.G.'s parents never requested her removal from the curriculum. Indeed, the record reveals the opposite to be true. When LMSD proposed to remove A.G. from the special education curriculum entirely, A.G.'s father expressed disapproval of the school district's proposal, insisting that a hearing officer decide whether A.G. continued to need special education classes. Additionally, A.G.'s mother testified that she approved the reduction in the number of A.G.'s ISL classes during her tenth grade year. After further review, LMSD recommended a further reduction in those classes. At every opportunity, A.G.'s parents

were given opportunities to review A.G.'s educational plan, and they never objected. This Court has observed that "where the parent agrees with, and gives informed consent to, a child's placement in special education, a child's feelings to the contrary can hardly constitute 'notice.'" *S.H.*, 729 F.3d at 266. Thus, A.G.'s personal testimony is insufficient to create a genuine dispute of material fact as to LMSD's knowledge.

*(2)*

A.G. next argues that LMSD acted with deliberate indifference based upon its "gross" and "knowing" violations of the IDEA during its evaluations of A.G. In making this argument, A.G. points to evaluations of her and diagnoses applied to her throughout her time in LMSD. Specifically, A.G. asserts that the diagnoses and labels applied to her by school psychologists were unsubstantiated and that the evaluations were defective for their failure to adhere to requirements set forth by the IDEA. According to A.G., her rights were violated because LMSD erroneously viewed A.G. as having a disability and, on that basis, placed her in special education classes, despite the fact that its process for doing so violated multiple regulatory requirements.

This argument fails because the relevant inquiry here is *knowledge*. A.G. does not argue that she did not actually require speech therapy when she was placed in special education. Rather, she argues only that the evaluations and diagnoses that resulted in her placement in the curriculum were defective. However, allegations that LMSD may have been wrong about A.G.'s diagnosis and arguments that LMSD's evaluation process was defective does not prove that LMSD had knowledge that it made the wrong diagnosis.

We have declined to consider allegedly defective evaluations as part of the knowledge analysis before and we decline to do so now. *See S.H.*, 729 F.3d at 266 n.26 ("We will not consider the allegedly defective evaluations as part of the knowledge analysis.").

A.G. also contends that a fact-finder could find deliberate indifference based upon LMSD's "knowing" violations of the IDEA because LMSD was put on notice in 2008 that she may not have a disability at all. A.G. points to Dr. Cosden's 2008 reevaluation, where he indicated that A.G. no longer had a specific learning disability based on his findings that A.G. demonstrated average intelligence in reading, math, and writing. A.G. argues that these findings demonstrated that she was erroneously placed in special education and, instead of performing a careful reevaluation to ensure that she was not erroneously placed in the special education program again, LMSD "simply shuffled A.G. into a different, catch-all-sounding category of 'Other Health Impairment' in blatant violation of the criteria for doing so." Appellant's Br. at 49. This, A.G. argues, proves that LMSD had knowledge of a substantial likelihood that A.G. had been misdiagnosed and failed to act upon this knowledge.

We conclude that this argument is unavailing. While it may be true that Dr. Cosden concluded that A.G. no longer had a specific learning disability, the evaluation he conducted tested not only her academic performance, but also her social, behavioral, and emotional functioning. Dr. Cosden noted concerns from A.G.'s mother about her performance on assignments at home, as well as her lack of ability to focus on work in school, and concerns from her teachers regarding inappropriate and disruptive behavior in

class.  Based upon Dr. Cosden's evaluations as a whole, it was his opinion that A.G. had "problems with focusing and difficulty controlling her emotions."  A922.  Dr. Cosden ultimately relied upon these findings when he changed A.G.'s disability classification to OHI.  Because he had a basis for his conclusions, it can hardly be said that Dr. Cosden or LMSD had knowledge at that point that A.G. may not have had a disability.  Although Dr. Cosden's classification of A.G. as OHI may have been in technical noncompliance with the IDEA, that fact alone does not provide a basis for a claim under § 504 or the ADA.  *See S.H*, 729 F.3d at 266 n.26 ("[E]vidence that the School District would have, or should have, known that [the plaintiff] was not disabled had the evaluations been free of defects, is insufficient.").

Moreover, A.G. may have performed well academically, but the results of her testing, taken as a whole, are inconclusive.  She received marks ranging from below average to above average on the various tests administered by Dr. Cosden.  A.G. failed to offer any evidence that students in special education do not have average intelligence, or that a student with a learning disability cannot perform well on standardized testing.  Without any evidence to suggest such a connection, A.G.'s argument fails to establish knowledge on LMSD's part.

*(3)*

A.G. next argues that the repeated nature of LMSD's violations could suggest to a reasonable jury that LMSD acted with deliberate indifference to A.G.'s rights.  A.G. contends that LMSD made multiple errors over the course of nearly a decade in

14

identifying A.G. as disabled.  This assertion, however, does not create a material issue of fact regarding deliberate indifference.  As previously indicated, potentially erroneous diagnoses and defective evaluation processes are insufficient to prove that LMSD had the requisite knowledge that A.G. may have been misidentified as disabled.  *S.H*, 729 F.3d at 266 n.26.  Likewise, it cannot be said that LMSD's continued evaluations and diagnoses throughout the course of her education effectively put LMSD on notice that A.G. had likely been misidentified.

*(4)*

A.G.'s final argument suggests that LMSD deliberately misled her and her family about her supposed disability, which proves that LMSD knew that A.G. may not have had a disability at all.  In support, A.G. references testimony from a related due process hearing between A.G.'s family and LMSD, wherein a Hearing Officer concluded in his Findings of Fact that:

> [LMSD] was of the belief that the Parents . . . were adverse to any suggestion that the Student had [ADHD] . . . However, at the time . . . the District's overall impression of the Student was that . . . the Student had ADHD.  In an effort to secure the Parents' approval of the 2008 [Reevaluation Report], the District intentionally avoided any reference to ADHD in that document.

A1261.  She also points to Dr. Cosden's deposition wherein he testified that, at a later meeting regarding A.G., he did not tell A.G.'s family he suspected she had ADHD.  A882-84.  A.G. contends that Dr. Cosden deliberately misled her family by not outwardly

expressing his concerns about his suspicions regarding ADHD because he was aware of

A.G.'s family's aversion to an ADHD diagnosis.

We find the evidence underlying this argument unpersuasive. Here, Dr. Cosden's

evaluation addressed concerns from A.G.'s own family regarding her problems with

focusing. Thus, his suspicions cannot be said to have been unfounded. Dr. Cosden

claimed that he suspected A.G. of having ADHD, but was unable to diagnose her as

having that condition with the information available to him. While he did not have a

label for A.G.'s behavior because of his inability to diagnose A.G., Dr. Cosden still

conveyed to A.G.'s parents, in a detailed report, that it was her "problems with focusing

and difficulty controlling her emotions" that qualified A.G. for special education services.

A922. Dr. Cosden may have been aware that A.G.'s family was averse to an ADHD

diagnosis, but that fact alone can hardly constitute notice on LMSD's part that A.G. may

not have a disability.

A.G. also attempts to argue that, intentionally or not, LMSD consistently failed to

inform A.G. and her family of basic facts pertaining to her placement in special

education. Appellant's Br. at 52. This failure on the part of LMSD, according to A.G.,

deprived her and her parents of the ability to make informed decisions about whether she

had been properly identified as a student with a disability. However, undisputed

evidence shows that A.G.'s parents received numerous Procedural Safeguards Notices

from LMSD and that they approved every action proposed by LMSD throughout A.G.'s

time in the program. Additionally, A.G.'s mother attended regular IEP meetings with

LMSD personnel and A.G. also began attending during her high school years.  These undisputed facts do not support a finding that LMSD deliberately misled A.G. and her parents or deliberately withheld information from them.  The facts also do not support a finding that LMSD was put on notice that A.G. may have been incorrectly identified as disabled, especially given that A.G.'s parents approved of and participated regularly in her program.

Given A.G.'s failure to point to any evidence that would create a genuine dispute as to whether LMSD knew that a harm to A.G.'s federally protected right was substantially likely, we must affirm the District Court's entry of summary judgment in LMSD's favor.

## IV.

For the reasons set forth above, we will affirm the order of the District Court.